**FIRST NAT. BANK IN LUBBOCK v. ALEXANDER et al. (No. 2974.)**

Court of Civil Appeals of Texas. Amarillo.
March 7, 1928.

Rehearing Denied April 4, 1928.

**1. Principal and surety &#9758;5—Defendant signing note with another to enable mortgage on farm stock of such other to be released held surety and not principal on note.**

Where defendant signed note with another in order that mortgage held by bank on farm stock of such other might be released, so that such other could become tenant on defendant's farm, *held*, that relation of principal and surety existed and defendant was not a principal on the note. .

**2. Principal and surety &#9758;33—Consideration for suretyship may be benefit to principal or surety or detriment to creditor.**

The consideration passing between the parties to a suretyship may be either of benefit to the principal or surety or of detriment to the creditor.

**3. Principal and surety &#9758;17—One signing note as surety for other maker may avail himself of legal protection as against creditor having knowledge of relation.**

A party who has signed a note as surety for the other maker may avail himself of the protection which the law affords a surety as against the creditor, where the latter has knowledge of the relation as surety, though relation does not appear from face of instrument.

---

&#9758;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes .

**4. Principal and surety ☞115(1)—Surety is exonerated to extent of value of security which creditor without surety's consent parts with or renders unavailable.**

If creditor without surety's consent parts with or renders unavailable any security or fund which he has a right to apply in satisfaction of the debt, the surety is exonerated to extent of the value of such security or to extent of impairment of its value.

**5. Principal and surety ☞17—Suretyship must appear from face of contract or be known to creditor for surety to be discharged by reason of creditor's release of securities.**

For surety to be discharged by reason of depreciation of equitable rights or remedies, as by reason of creditor's releasing securities which could be applied to payment of debt, suretyship must appear from face of contract or be known to creditor.

**6. Principal and surety ☞115(1)—Where mortgage securing note was released without surety's consent, surety held entitled to have note reduced by difference between value of property and amount of prior liens.**

Where bank released mortgage securing note without consent of surety on such note, and property secured by mortgage which was also subject to prior liens was sold, *held*, that surety was entitled to have deducted, from amount of note, difference between value of property and amount of prior liens.

Appeal from District Court, Lubbock County; Clark M. Mullican, Judge.

Action by the First National Bank in Lubbock against Ollie Alexander and others. From the judgment, plaintiff appeals. Reversed and rendered.

Wilson & Randal and J. L. Kilpatrick, all of Lubbock, for appellant.

Lockhart & Garrard and F. D. Brown, all of Lubbock, for appellee Lulu Morris.

Morrison & Morrison, of Big Spring, for appellee State Nat. Bank.

RANDOLPH, J. This suit was filed in the District Court of Lubbock county by appellant; as plaintiff, against Mrs. Lulu Morris, A. L. Wasson, and the State National Bank of Big Spring, as defendants. Ollie Alexander was an original defendant in the suit, but he was disposed of by the dismissal of the suit against him, as noted in the first amended original petition, for the reasons that his place of residence was unknown, and that he is openly and notoriously insolvent. On the trial, judgment was rendered that the plaintiff take nothing by reason of its suit against the other defendants (except for the sum of $125 tendered and paid into the registry of the court by the defendant the State National Bank of Big Spring), and for all costs of court, from which judgment the plaintiff has prosecuted its appeal to this court.

The plaintiff's suit is based on a note for $664.55, executed by the defendant Mrs. Morris and the said Alexander. It appears that Alexander was indebted to the plaintiff bank in the amount of the note, the payment of which was secured by a chattel mortgage on certain personal property belonging to Alexander—consisting of six horses and mules and also on the said Alexander crop on the Wright farm in Howard county. It further appears that Mrs. Morris wanted Alexander to become her tenant on her farm in Lynn county. When Alexander approached the bank to know if the bank would carry him for an additional amount, he was told that it would not. Then he wanted to know about moving the stock to Lynn county. This, the bank would not agree to, but required him to pay off the mortgage. Alexander and Mrs. Morris then agreed to execute a joint note if the bank would release the teams, and this proposition was accepted; Mrs. Morris and Alexander signing a new note and the bank then releasing its mortgage. That was on the 12th of December. Some time in January following, the bank was informed that Alexander had not moved to Mrs. Morris' farm in Lynn county. But the note was thereafter renewed and both Alexander and Mrs. Morris signed it. Mrs. Morris was not present at the time Alexander signed it, but when the bank 'phoned her she came down and signed the renewal note. The bank knew that Alexander had given a mortgage for $1,000 to L. B. Wright, and Alexander told its officers that he had given a mortgage to the bank at Big Spring for a like amount. The bank then demanded a mortgage, and Alexander executed a new mortgage, the one here in question. This last renewal note was for $664.50. Alexander, in July, called the bank over the 'phone and stated that owing to the drought conditions he could not get any more money and he could not make a crop without assistance, and that people were threatening to close him out, and stated that he could sell the place and cover his debts down there, if the bank would release the mortgage, and was informed that the bank would not do this unless it got its money. This conversation was over the 'phone from Big Spring to Lubbock. Alexander called again the next day, and told the plaintiff bank that "they were going to foreclose the mortgage," and that he had a conversation with the bank, and that he could get the plaintiff bank $100 it if would release its mortgage, and the plaintiff bank again refused to do so.

Mr. Slaton, president of the plaintiff bank, testified further:

"I also heard from Mr. Currie, or some one from the State National Bank of Big Spring. He called me up and made practically the same statement. Offered to give me $100 to release the mortgage, and refused to give me $300. Stated that he couldn't get it because they couldn't get all of their money. I told him

to go ahead and foreclose. On the next day Mr. Currie had a conversation with Mr. Denman. The substance of his conversation with Mr. Denman was that they would give $125 if we would release the mortgage, and that if we didn't release they would take steps and go ahead and foreclose. I believe he said that there wouldn't be enough hardly to cover the indebtedness there. I think he said that if we foreclose it will not cover the debts here. After these conversations I tried to get Mrs. Morris on the 'phone and couldn't get her. So I wired the bank there that we would accept the $125. Would release the mortgage upon receipt of $125. That is the telegram that was introduced in evidence by Mr. Currie. It was dated the 23d of July. I saw Mrs. Morris on the 27th of July. She came to the bank. I told her about it. About the telephone conversation and what I had done and I told her that was the best we could do. She replied, 'I expect that's right.' Then she went out of the bank and returned and said she wouldn't do it. She was gone about an hour. She said that she had reconsidered and that she wouldn't accept it, wouldn't consider the release. It was my understanding that she had consulted an attorney. At the time of the first conversation I had with Mrs. Morris, I had not received the draft for $125 from the Big Spring Bank that I had wired I would accept. But when she returned and said that she would not consider it, we had received it. After this second conversation with Mrs. Morris, in which she stated that she wouldn't accept it, I wired the bank that she wouldn't agree to it. I don't believe that I had received the $125 at the time I sent the wire to the bank, but I received it some time that day. I returned the draft. I returned the identical draft just as it was received.

"I saw Mrs. Morris on the 27th of July. I saw her before I sent the second telegram. Whatever date I sent the second wire I had seen Mrs. Morris before I sent it. I can't be positive as to dates, but I had seen her before I sent that wire. I am not sure whether the draft was returned the day we received it, or not. I did not return it personally; I instructed Mr. Bedford to return it. I don't think I had the draft on July 26th, when I sent the telegram. The note was Alexander's debt originally. I don't know whether Mrs. Morris got anything from that debt or not. She didn't get anything from the bank. So far as I know she never received any benefit whatever. She told me that Alexander had not moved on her farm. Alexander also told me that. So far as I know, Mrs. Morris never received any benefit from the signing of that note. When I sent the telegram accepting the offer of $125 for the release of the mortgage, I had not consulted Mrs. Morris, but I had tried to get her over the 'phone. That constituted a release without her knowledge or consent."

Mrs. Morris also testified:

"I was not in Lubbock on the 23d day of July until about 6 o'clock in the evening. I don't think that I learned anything that evening about Alexander selling out, but I did learn it the next afternoon. Mr. Wright told me. The first time I talked with Mr. Slaton was Monday morning. I went in the bank to talk to him, and he said, 'I expect I have done something that I should not have done.' And I said, 'What have you done?' I didn't know anything about the release at that time, and he went over the various telephone calls that he had had from Big Spring with the bank and Mr. Alexander. He said that they had told him that the crop was all burned up, and that the bank wouldn't furnish any more money to work it, and Alexander was forced to sell out, and that he had agreed to release the mortgage for $125. And when he told me that, I said, 'And you have released it for $125, and you mean to say that you have released that and expect me to pay the rest of it?' Just at that time Mr. Slaton was called to the telephone, and he said, 'Excuse me, I will have to go.' At that time we were in the bank, and when he went to the 'phone, I got up and left the bank. I didn't go to see any attorney, or anybody else. I was so worked up over what had taken place, I finally, about 4 or 5 p. m., called Mr. Slaton on the telephone and told him I wouldn't agree to the release of the mortgage. He said, 'Well, if you won't, I will try to get hold of Mr. Denman and have him wire the bank we won't release.' So the next morning, or a day or two after, I decided I would go down and investigate. The second wire appears to have been sent from Lubbock at 6:38 p. m., on the 26th of July. That was after we had had the conversation.

"I never talked to Mr. Slaton about releasing the teams of Alexander before I signed the note. I did talk to him about the matter after I had signed the note and had learned that Alexander had moved to Big Spring. He said in that conversation that about all we could do was to let it run along until it was due, and we will have him come up and will just take some of the crop and try to secure it that way. Take a mortgage on the teams, implements, crop, everything he had, in order to secure it. I went to Big Spring to see Mr. Alexander after he had moved down there. He said for me not to worry about the note; that when it came due, if he couldn't pay it, that he would secure it so that I would be perfectly safe. He said he would secure it with a mortgage on the teams, implements, and plenty of other stuff. I have never received anything or any benefit from the signing of that note. It had cost me a lot of money."

[1] It will be seen from the above that the relation between Alexander and Mrs. Morris was that of principal and surety, and this status of Mrs. Morris was known to and understood by the plaintiff. The fact that the mortgage of the bank was released upon the work stock of Alexander in order that he might use them upon Mrs. Morris' farm did not constitute her a principal on the note, in the absence of an express agreement that she would become a principal thereon. While the benefit anticipated by her, i. e., securing Alexander as a tenant on her farm, induced her to sign the note with Alexander, it did not have the effect to make her a principal, for as between her and Alexander, within the knowledge of the bank, Alexander was to pay the note and she was simply a surety to pay in the event he failed to do so. "Surety-

ship, in its broadest sense, is the relation occupied by a person liable for the payment of money or for the performance of an act by another, such liability being collateral as to such person, and who is liable to suffer loss in the event of the failure of such other person to pay or perform, but whose liability is terminated at once, fully and completely, if such other person does pay or perform." 32 Cyc. p. 14. "A surety, as we understand it, is a person who, being liable to pay a debt or perform an obligation, is entitled, if it is enforced against him, to be indemnified by some other person, who ought himself to have made payment or performed before the surety was compelled to do so." Hall v. Johnston, 6 Tex. Civ. App. 110, 24 S. W. 861.

[2] The consideration passing between the parties may be either of benefit to the principal or surety, or of detriment to the creditor. Baker v. Wahrmund, 5 Tex. Civ. App. 268, 23 S. W. 1023.

[3] A party who has signed a note as surety for the other maker may avail himself of the protection which the law affords a surety, as against the creditor, where the latter has knowledge of the relation as surety, though that relation does not appear from the face of the instrument. Morris v. Booth (Tex. App.) 18 S. W. 639; Bank v. Skidmore (Tex. Civ. App.) 30 S. W. 564; Burke v. Cruger, 8 Tex. 66, 58 Am. Dec. 102; Kellogg v. Iron City National Bank (Tex. Civ. App.) 26 S. W. 856.

[4] If a creditor, without the consent of the surety, parts with or renders unavailable any security or fund which he has a right to apply in satisfaction of the debt, the surety is exonerated or discharged to the extent of the value of such security or to the extent of the impairment of its value. Kempner v. Patrick, 43 Tex. Civ. App. 216, 95 S. W. 51.

[5] In order that a surety may be discharged by reason of the depreciation of equitable rights or remedies, as by reason of the creditors releasing securities held by them, which would inure to the benefit of the surety, in that such security can be applied to the payment of the debt, such suretyship must appear from the face of the contract or be known to the creditor. Burke v. Cruger, supra.

[6] The appellant contends that the plaintiff's mortgage being subject to a mortgage to the Big Spring Bank for about $1,000 and also subject to a mortgage to L. B. Wright for about $1,000, and also to secure Wright for advances for the year 1926 made by Wright to his tenant, Ollie Alexander, and also to secure L. B. Wright for indorsements made by Wright for Alexander on notes to Hodges Bros., and that Wright had signed with Alexander a note for $467, payable to Hodges Bros., and one to the Big Spring Bank for $225, and the aggregate sum of all such indebtedness being $1,292.25, the court erred in submitting to the jury as to what amount was due L. B. Wright on July 23, 1926, the time that Wasson purchased the property, and the appellant released its mortgage, and that the appellant was therefore entitled to judgment against Mrs. Morris for the amount sued for, less the sum of $125 tendered into court.

The recitals in the mortgages of indebtedness of $1,000 to the Big Spring Bank and the $1,000 indebtedness to Wright does not represent the real indebtedness to those parties. Wasson paid $1,524.50 for the property he purchased, which was subject to the three mortgages. This purchase money was paid out as follows: $824.50 to the Big Spring Bank; $467.11 to take up the L. B. Wright note; and $125 tendered to the First National Bank in Lubbock, $3.30 paid for incidentals in these transactions, and $104.59 paid to Alexander. These constituted all the debts secured by the three mortgages except the balance due and owing to the First National Bank in Lubbock, after being credited with $125 tendered into court.

The trial court submitted to the jury the question: What was the total value of the crops, the ten head of live stock, farming implements, and equipment purchased by defendant Wasson from Alexander at the time he bought same? To this question the jury answered: $1,750. The jury further found that Alexander did not on the 23d day of July, 1926, owe L. B. Wright anything.

These issues, as found by the jury are abundantly supported by the evidence. It appears therefore that the total indebtedness secured by the mortgages upon Alexander's property, to the State National Bank of Big Spring, amounted to $824.50, and, whether calculated as a debt owing to Wright or secured by Wright's signature as surety thereto, the so-called Wright indebtedness amounted to $467.11. These two items aggregate $1,-291.61, and was the total indebtedness due and owing to the Big Spring Bank and to Wright under their two mortgages. Of the amount received from Wasson, $104.59 was paid to Alexander. This sum was subject to the mortgage of the First National Bank in Lubbock. Therefore it was a distinct loss to Mrs. Morris.

The jury having found the value of this property as being $1,750, if we deduct the sum of $1,291.61 from that amount, it will leave $458.39, which should have been applied as a payment on the note of the plaintiff bank herein. This amount deducted from the face of the plaintiff's note leaves $206.16.

We therefore reverse the judgment of the trial court and here render judgment in favor of plaintiff, the First National Bank in Lubbock and against Mrs. Lulu Morris, for the sum of $206.16, together with interest at the rate of 10 per cent. per annum from November 8, 1926, to this date, and 10 per cent. upon such amount and interest as attorney's fees.