T. W. BUCK, Jr., Appellant,

v.

H. M. REED, Appellee.

No. 11003.

Court of Civil Appeals of Texas.

Austin.

July 15, 1964.

Rehearing Denied Aug. 24, 1964.

Harry S. Pollard, Austin, for appellant.

Gay & Myers, Austin, for appellee.

HUGHES, Justice.

Our previous judgment reversing and remanding this case to the Trial Court has been reversed by the Supreme Court and the case remanded to this Court for a determination of appellant's points Nos. 4, 6, 8, 10, 12, 14, 16 and 18. 370 S.W.2d 867. Reference is made to the opinion of the Supreme Court for a complete statement of the nature of this suit. It is sufficient at this point to say that H. M. Reed, appellee, sued T. W. Buck, Jr., appellant, on a promissory note for $9300.00 dated August 31, 1953, payable to J. H. (Dude) Stelfox, executed by appellant and Glen Malcolm Shine. The note was given in payment for one HD–14 Allis Chalmers Tractor with Bulldozer Blade and Power Unit Serial No. 1669, belonging to appellee. Stelfox was the agent of appellee in making sale of the tractor and equipment and he assigned the note in suit to him without receiving any consideration from appellee.

Trial to the Court without a jury resulted in judgment for appellee for $15,370.03, with 10% interest thereon until paid.

The points of error which we are to determine, enumerated above, are that the following findings of fact made by the Trial Court so contrary to the overwhelming weight and preponderance of the credible evidence as to be clearly wrong and unjust:

"10. J. H. (Dude) Stelfox did not on June 13, 1953, or at any other time represent to Glen Malcolm Shine or T. W. Buck, Jr., that the bulldozer described in Paragraph 3 above was manufactured in 1948 or any other year.

"11. J. H. (Dude) Stelfox did not on June 13, 1953, or at any other time represent to Glen Malcolm Shine or T. W. Buck, Jr., that the bulldozer described in Paragraph 3 above was in as good as brand new condition.

"12. J. H. (Dude) Stelfox did not on June 13, 1953, or at any other time represent to Glen Malcolm Shine or T. W. Buck, Jr., that the bulldozer described in Paragraph 3 above was in efficient operating condition.

"14. Neither Glen Malcolm Shine nor T. W. Buck, Jr., relied on the statements made by J. H. (Dude) Stelfox set forth in Paragraph 12 or on any other statements made by Stelfox but they relied entirely on their own knowledge, observation and testing of said bulldozer in purchasing it.

"20. The consideration for the note described in Paragraph 1 above was the settlement, compromise and satisfaction of all claims, demands and disputes concerning the condition of the bulldozer described in Paragraph 3 above.

"21. J. H. (Dude) Stelfox did not, in connection with the settlement described in Paragraph 19 above, make any statements or representations concerning the condition of the bulldozer described in Paragraph 3 above.

"22. Neither Glen Malcolm Shine nor T. W. Buck, Jr., relied on any statements or representations of J. H. (Dude) Stelfox made on or about August 31, 1953, concerning the condition of said bulldozer or concerning any other matters involved in the sale of said bulldozer or the cancellation of the first note and execution of the second note.

"23. Prior to August 31, 1953, Glen Malcolm Shine had full opportunity to test, operate and inspect said bulldozer and had so tested, operated and inspected said bulldozer fully and on said date he was fully informed as to its mechanical condition and knew more about its condition than did J. H. (Dude) Stelfox.

We will review all of the evidence bearing on these findings.

Mr. Shine, who lived in Houston, had served in the Sea Bees in the Pacific area during World War II with appellant. In May 1953, Shine and his family came to Austin to visit appellant, who was a life long resident of Austin, and his family. The visit was purely social. A week later Shine returned to Austin and told appellant that he could get suitable work around Madisonville if he had a bulldozer tractor and that he had seen one in Austin, describing its location. Appellant, who was acquainted with and had worked for Stelfox, recognized the location as belonging to Stelfox. Appellant ascertained that the tractor was for sale and so informed Shine by letter, Shine, having returned home. He returned to Austin about June 13, 1953.

Appellant, who merely lent his name to Shine testified:

"Q Were any representations made to you at the time of the original sale about the condition of the tractor by Stelfox or anybody else?

"A Naturally it was made that the tractor was in A–1 condition, and as Mr. Stelfox stated in his testimony, it was the same as new * * *

"Q Mr. Stelfox made the representation * * *

"A That is correct.

"Q Did he mention the year in which it was manufactured or sold?

"A It was my impression it was supposed to be a '47 or '48 motor, and * * *

"Q You are sure * * *

"A I am positive of that."

Shine testified:

"Q When you all went over to Mr. Stelfox, you say he introduced you. Then what conversation did you have with Stelfox?

"A Well, I just talked to him about the machine. I asked him what model it was.

"Q What did he tell you?

"A He told me it was a 1948 Allis-Chalmers HD-14.

"Q What other conversation did you have with him?

"A He immediately told me about the repairs he had done to the machine. He said he spent somewhere between four to five thousand dollars on it in repairs. He had a new engine in it and new rollers, new track, new track bolts, and numerous other odds and ends that you do to a machine where you put it in condition for resale.

"Q Did he make any statement as to its condition?

"A He stated that it was actually in as good condition as a brand-new machine, as far as—working condition. * * *

"Q What influenced you as to this particular machine? I understood you to say that in passing by there and looking at it, it was all painted and looked like new.

"A Right.

"Q What was it that influenced you in this particular machine?

"A This particular machine, what caused me to be interested was the fact that it had been supposed to be reconditioned and all this work done on it. He explained the numerous things that had been done to the machine and I honestly thought that I could take the machine and put it to work. I was not particularly interested in purchasing the machine. I mean to say, he was as interested in me taking the machine, it seemed like, as I was in obtaining it. I looked no other place for a machine, and actually did not care whether I had the machine or not. I did have the work for it, and I was not engaged at the time, and I thought, 'Well, it would be a working situation for both of us. I will take the machine over there and be responsible for it and attempt to work it.'

"Q When he explained to you that this was a '48 model tractor, did you have any reason to disbelieve that?

"A No, sir.

"Q Did you believe his statement and rely on it?

"A Yes, sir.

"Q When he told you that he had spent between $4,000 and $5,000 in reconditioning it to make it as good as brand-new, did you believe that?

"A Yes, sir.

"Q Did you rely on that?

"A Yes, sir, sure did.

"Q Did he tell you whether or not this machine, because of its recent manufacturing time and reconditioning, would or would not do the job that you told him that you could get over there to use that machine on?

"A He assured me that it would. I explained to him what I was going to use it for, and he assured me the machine would do it.

"Q On the basis of those statements and your reliance on them, did you then agree to buy the machine?

"A Yes, sir, I agreed.

"Q And on what price?

"A We agreed on $10,000.

"Q Was there any cash down payment on that at all?

"A No, sir. * * *

"Q Now, were you acquainted with the different year models of Allis-Chalmers tractors or any other caterpillar tractors?

"A I was acquainted with the fact that there are several different year models. For several years in a row they may build a machine that the layman's eye could not distinguish the difference between a '48 and whatever year it was manufactured in.

"Q Were you familiar enough with the machine that you could tell by looking at it whether or not it was manufactured in 1941, '42, '48, or '46?

"A No, sir.

"Q There was no outward appearance that would indicate to you what the year model of the machine was; is that correct?

"A That is correct."

Shine commenced working with the tractor about the middle of July 1963. He did some "light" jobs with the tractor such as clearing brush, cleaning dirt tanks and digging shallow tanks. About the 10th of August, 1953, the clutch on the tractor went out, concerning which Mr. Shine testified:

"Q Just describe to the Court what resulted from the clutch going out on it; describe what you mean by the steering clutch going out and the condition it was in then.

"A The steering clutch, you have a right and a left steering clutch. That is the way you steer the tractor instead of having a steering wheel. So if the right-hand clutch went out, you could not steer the tractor. You could move the tractor, but you could not steer it, and consequently I tore into it. I had a working knowledge of mechanics, and I thought I was competent and that I could make repairs on it, so I tore into it and found out what the trouble was.

"Q What do you mean by tearing into it?

"A I disassembled it.

"Q You disassembled it?

"A I disassembled it; I tore it down.

"Q Did you examine it?

"A Yes, sir.

"Q What sort of damage did you find that resulted and what did you determine had caused it?

"A Well, there is a steering clutch drum, perhaps that big around, and it has a flange that it bolts into, and this flange gears into the pinion drive up on the outside of it, and there were bolts left out of the flange where the steering clutch drum bolted to the flange. About every other bolt was left out of it, and consequently not having enough bolts in it, it tore the whole side of the flange out or tore the whole side of the drum out where it bolts to it, and in doing so, it tore up some bearings and clutch discs and I don't remember exactly, but I spent about $290 on parts for it.

"Q About how long did it take to obtain those parts and about how long did it take to get the labor done to repair that damage that had resulted?

"A I was two weeks getting the parts and repairing it.

"Q All-told, about what did you have to spend out of your pocket for these parts to repair that?

"A Just the parts themselves right at three hundred. Of course, I bought gas and had expenses, and what have you, going to Houston to find the parts."

Following this breakdown of the tractor and before doing further work with it, Shine came to Austin and talked with Stelfox, and we quote Shine:

"Q  What conversation did you have with Stelfox at that time?

"A  I explained to him what the deal was and told him I did not think the machine was what it was represented to be.  He pointed out to me that he had not done anything to the steering clutch, to his knowledge, and he was sure the rest of the machine was all right, and as he had stated that it would be, and so I was still reluctant.  He said, 'Well, I will tear up the note, and I will knock off $700 for the trouble that you have had on the steering clutch, and we will make a new note and reduce the payments on the machine.

"Q  Did he say anything about the remaining condition of the machine?

"A  Yes; he still assured me that he had done all the work on the motor and the tracks and the rollers and various things were in real good *things* on the machine and that he had spent four or five thousand dollars on it, and the machine had to run, and I explained to him I had not run the machine enough to make the payments on it with, and he said, 'Well, don't worry about that.' "

The result of this conference was that the $10,000.00 note was cancelled and the note sued on executed, Shine having explained the matter to appellant.  At the same time Shine gave Stelfox $700.00 in checks, payable to appellant as requested by Stelfox, to be deposited at short intervals.  None of these checks was paid on presentation.  These checks were, Shine testified, to apply on the $9300.00 note.

Stelfox testified they were not, that the new note was signed only to reduce the payments from $1000.00 per month to $700.00 per month.

Shortly after the new note was given Shine moved the tractor to Teague where he had a dam job for the tractor.  He worked a day and a half and the "motor went out."  We quote Shine:

"Q  You looked into the motor?

"A  Yes, sir.  I pulled the head off of it and pulled the side covers and the pan off of it and inspected it.

"Q  What did you discover the condition to be?

"A  Well, the motor was completely shot and wore out.  There was pieces of broken rings and small pieces of aluminum which probably came from a previous broken piston, and the crank shaft was flat—had three-thousandths wear in it. * * *

"Q  What did you do when you found this condition existed inside the motor after you opened it up and looked at it?

"A  I made arrangements to get another machine, because I had a time limit on this job.

"Q  Did you order any parts or did you leave it like it was?

"A  I ordered parts for it.  I had to, so I could get it running and move it out with a truck.

"Q  You say you had a time limit on that job?

"A  Yes, sir.

"Q  But you had to rent another machine because this tractor had busted down?

"A  Yes, sir.

"Q Then what happened?

"A Well, I ordered the parts, and I went to Dallas and picked up the parts. I picked up rings and inserts and I think one or two pistons, I don't remember, and of course gaskets and a valve or so."

It was at this time that Shine first became aware that he did not have a 1948 model tractor, but instead a 1942 model. Shine installed the parts obtained in Dallas and repaired the tractor "sufficient to get it running," and he "walked it (tractor) into town" and put it in storage.

Mr. Shine testified that he would not have purchased the tractor and would not have executed either of the notes if he had not relied upon the statements by Stelfox as to the model of the tractor, its condition and the amount of repairs made on it.

When Shine first saw the tractor, he tried it out. We quote him:

"A The first time I saw the tractor it was eye appealing. It looked like it was a newly reconditioned tractor and had a new paint job on it. The first time I saw it I did not stop and look at the tractor, but I saw it as I went by.

"Q Now, when you went over and talked to Stelfox about the tractor, did you try it out at all?

"A The best you can on a city lot.

"Q Well, what did you do?

"A I started the engine and moved it backwards and forward and spun it around one time.

"Q Well, did you do it on your own or were you invited by Mr. Stelfox?

"A Well, there wasn't any objections to me doing it.

"Q Just describe what you did. Did you start the engine?

"A I asked him was the batteries up, and he said 'yes, get up in it and start it.' So I got up and started the machine, and as I say, moved it forward and backwards, and tried the steering clutches, and I cut it one way and then the other to see if it was working. You could not do a lot with it on a city lot like that, because you would tear the thing up. * * *

"Q But I am trying to see if Mr. Stelfox was not perfectly willing for you to do anything you wanted to test that machine short of tearing his building down or ruining his place.

"A Yes, sir, he was, anything within reason in relation to the space we had to do it in.

"Q After you had examined it and operated it and listened to the motor, you were satisfied with it, weren't you?

"A I was satisfied with the way it sounded, yes, sir."

On cross examination of Shine it was brought out that he was an experienced bulldozer operator and that he was qualified to do repair work on bulldozers.

Shine testified:

"Q You undertook to rebuild the machine as far as the clutch box was concerned, is that right?

"A Yes, sir.

"Q And you testified that you were very dissatisfied and were ready to tender the machine back; isn't that what you said?

"A By the time I got over here, I certainly was.

"Q Did you have the bills with you at that time?

"A Yes, sir, I had the bills.

"Q Did you tender them to Mr. Stelfox?

"A Yes, sir.

"Q Did he pay them?

"A No, he did not pay any cash. He said, 'Well, I will tell you what I will do, Shine.' He said, 'We will make a new deal on the machine.'

"Q You did not have $700 worth of bills on the machine, did you?

"A I did not have that as far as parts spent, but I had $700 worth of time involved in it.

"Q I suppose you told him you were dissatisfied with the machine?

"A Yes, sir.

"Q And in fact you exchanged notes and gave a $9300 note with a longer pay-out for the $10,000 with a ten month pay-out, didn't you?

"A In effect, you might call it that. I did not think of it as such. The way he explained it, he said, 'Well, we will make a new note, and I will compensate you $700, and re-sell you the thing on a new note, and we will start all over.' * * *

"Q You told him that you were dissatisfied with the whole machine and did not think it had been represented correctly?

"A He reassured me that it was as he represented it. He said, 'I spent four to five thousand on it, and I had so-and-so done, and the motor is in perfect shape.' "

Shine had carefully examined the exterior of the tractor before purchasing it but regarding the motor, he testified:

"Q * * * You knew more about the tractor than he did.

"A I certainly did not. I did not know what had been installed in the tractor. It was represented to me with new motor kits, and everything else, and that motor was completely wore out when I took it down.

"Q You had run it for a month and a half?

"A I had it in my possession, but I had not operated it a month and a half.

"Q During the one and one-half month period you had been operating it from time to time, hadn't you?

"A Over intervals, yes, sir.

"Q And you continued to operate it until it broke down with some motor disorder?

"A At intervals, yes, sir."

Shine has tendered the tractor back to appellee and has testified that it is in as good condition as when he bought it.

Mr. Ernest J. Kohutek, associated with the Allis-Chalmers dealers of San Antonio, testified for appellant. We quote a portion of his testimony:

"Q What year model or manufacture is HD–14, Serial 1669, tractor?

"A That tractor was manufactured in July, 1942.

"Q Is there any obvious, visual difference in appearance between an HD–14 tractor that was manufactured in 1948 as distinguished from one that was manufactured in 1942?

"A No, just the appearance, you can't tell."

After qualifying, Mr. Kohutek testified as to the difference in values of a 1942 and 1948 HD–14 tractor as follows:

"Q And will you tell us the values of the 1942 manufactured tractor, HD–14, if it is in A–1 condition, and its value in fair condition, and its value in poor condition in June or August of 1953?

"A  In A–1 shape, it would be from five to six thousand dollars; fair shape, two to three thousand dollars; and in poor shape, that is poor operating shape, it would be from five hundred to fifteen hundred dollars. * * *

"Q  What would have been the value if it was a 1948 manufactured? Would it have been more than a 1942?

"A  Oh, yes, sir.

"Q  What would have been the greater value of the '48 tractor, an HD–14, manufactured in 1948?

"A  I would say a '48, between eight to nine thousand.

"Q  What would be the fair market value of an HD–14, '48 manufactured tractor, of that particular model if it was in just fair condition?

"A  In fair condition it would be, I would say, between $4,500 and $5,000."

Mr. Kohutek testified that for practical purposes the 1942 and 1948 tractors were the same and that from their appearance one could not be distinguished from the other.

Mr. Roy C. Green, shop foreman for Central Texas Equipment Company and formerly employed by H. B. Zachry and Holland Page, testified for appellant. His testimony related to repair work he did on the tractor in suit from 1951–1953. He replaced the motor kit (sleeves, pistons, rings and valve job) for Stelfox in late 1952 or early 1953 at a cost of $600.00. About two weeks after this repair was made, Mr. Green was requested by J. R. Canion, to go to the City filtration plant to work on this tractor, and we quote his testimony:

"A  The motor had frozen up on the HD–14 tractor I had previously put a motor kit in.

"Q  That is the Serial 1669 tractor?

"A  Right-o.

"Q  The motor had frozen up?

"A  Yes, sir.

"Q  What caused it to freeze up?

"A  They started it without water in it.

"Q  What do you mean by it froze up?

"A  The pistons seized to the sleeves and pulled three of the sleeves in two and locked the motor tight.

"Q  So it was not runnable when you got out there?

"A  No, sir.

"Q  Did you do at the request of Canion some repairs on that frozen motor?

"A  Yes, sir.

"Q  What sort of repairs did you do on it?

"A  I replaced the three broken sleeves.

"Q  You replaced the three broken sleeves?

"A  Yes, sir.

"Q  Was there any other damages resulting from the operation of that motor without water in it?

"A  Well, the motor had got awfully hot.

"Q  What would that cause? What effect, if anything, would that heat that caused it to freeze up have on that motor? What effect it did have.

"A  It caused the pistons to expand and pulled the sleeve in two and I replaced the sleeves, but as to any other damage that was done at the time, well, I can't say that it done any immediate damage at the time. Naturally, it hurt all the wearing parts of the motor to some extent.

"Q Now, did you at that time attempt to, or did you go in and repair all of the consequential damage that came from this heat that froze up the motor?

"A No, sir, I just replaced the sleeves.

"Q By replacing the sleeves, would that just permit the motor to start up and run?

"A Yes, sir, the motor was in running condition when I left it.

"Q Having replaced those sleeves as a result of the motor having been run while it was without water and got so hot that it froze up, would that have restored that motor to an equal condition to what it was in at the time you completed the installation of the motor kit?

"A No, sir, it would not. * * *

"Q Do you know, Mr. Green, what the year model of that tractor was, the manufactured date of it or approximate date of it?

"A It is approximately a '41 or '42 model.

"Q Is there any difference to the normal person's eye as between one HD–14 model Allis-Chalmers tractor, manufactured in 1942 and one that was manufactured in 1948?

"A No, sir.

"Q There is no difference to the eye?

"A No, sir.

"Q Was there any internal difference to it, assuming both were brand-new machines?

"A Yes, sir.

"Q What are those differences?

"A Clutches. Transmission.

"Q Is it for the better or the worse as between the '42 and '48 in those respects?

"A Well, they are improving on them at all times."

Mr. Green also testified that this HD–14 tractor, in fair operating condition, had a market value in the summer of 1953 of $3500.00 to $4000.00. If it had been a 1948 model the value would have ranged from $6200.00 to $7100.00, according to Mr. Green.

Mr. Green also testified that immediately after installing the motor kit, the tractor was not in "as good as brand-new condition."

Appellee testified by deposition and very briefly in person at the trial. He did not testify to the cost of the tractor. The only repairs he could remember making on the tractor were those done when the tractor was stored with Holland Page, and by some one out on the "Dallas Road." He "guessed" these latter repairs cost around $1000.00. He did not know the cost of the repairs made by Page. Although the depositions of appellee were taken in October 1960 and the trial was held in January 1962, the only record furnished for repairs on the tractor was the receipted bill of Mr. Green for $979.50, for the repairs about which he testified as shown above.

Mr. Stelfox testified by deposition only, which was introduced by appellant. He testified that he sent two men to West Texas to bring the tractor to Austin at the request of appellee. This was about six to nine months before the sale to Shine. Stelfox testified that he "put new rollers on it, new rails, new track bolts, and a complete new motor kit," and that he spent close to $4,000.00 on it. We quote his testimony in this respect:

"A We brought it to my location at 903 Barton Springs Road; then I got hold of Bob Marshall's heavy equipment mechanic and had him check the tractor, other than the

motor, the rollers; the rails, and he came up with a list of stuff to put the tractor up in condition to where it would go out and do a day's work. It needed new rollers, new rails, and new drag bolts. I ordered all of those from San Antonio, and he put them in.

"Q Who did that, who put them in?

"A This mechanic.

"Q Do you remember his name?

"A No, I don't, but I could find out from Bob Marshall. I paid him.

"Q By cash, or by check?

"A I can't remember, but I am sure I give him a check, a company check, and Mr. Reed reimbursed me.

"Q After he did that, then what happened?

"A Then, when he got through with that, I had Mr. Green in this heavy equipment shop on the Dallas Highway order a motor kit, and put a complete motor kit in.

"Q What is a motor kit?

"A That consists of rings, your pistons, your sleeves, and everything inside the motor. A kit costs you around $800, so I spent a little over $1,000 on this tractor.

"Q What was the cost of the other repairs the fellow from Marshall's did?

"A I believe the rails cost $700, the bolts cost $74.00; I remember that, because I like to went through the ceiling when I got the bill, and the rollers—I have forgotten now exactly how many—all of them wasn't bad—I would say we paid in the neighborhood of $1800, or $2,000.00 on parts alone that the mechanic of Bob Marshall's installed, plus the motor, complete overhaul by this Green equipment company that used to be out on the Dallas highway.

"Q To your best recollection is that it was between $2,000 and $2500 on parts—

"A Parts and labor.

"Q —after you brought it back from West Texas?

"A Around $4,000 altogether."

Regarding the model of the tractor, Stelfox testified:

"Q Do you know what year model it was? You know the—

"A I don't remember.

"Q —model number was HD–14?

"A That's right.

"Q And the serial number was 1669?

"A That's right.

"Q But you don't know what year model or what its' manufacturer was?

"A I could find out very easily.

"Q Did you ever know it?

"A I don't remember anything ever being said about the year model. In fact, I can't remember anything being said about it, other than referring to it as HD–14, which is equivalent to D–6. * *

"Q Did you ever know what the year of manufacture this particular tractor was?

"A I don't believe I can answer that and be truthful, because it has been so long ago that it could have been at that time I did or I didn't know, and I don't know why I would need to know the year model, because a serial number is all you order parts by, ordinarily."

Stelfox told of the sale to Shine as follows:

"Q  What did you tell Shine?

"A  I told him the bills I had spent for repairs on it, and I told him to go out there, both of them, and both of them try it.

"Q  You told Shine the tractor had just been repaired?

"A  I told him what had been spent on it.

"Q  What had been done in your shop and what had been done in the other shop?

"A  I would say around $4,000.

"Q  What did you tell him about the condition?

"A  You dont' have to tell a man that if he owns heavy equipment. It had new rollers, and new rails, and everything there for him to see. Of course, the inside of the motor, you couldn't see. They come back and agreed it was in good shape.

"Q  Did they run it there at the time?

"A  They started it and spun it around on the back lot.

"Q  Did you tell them anything about its condition, other than about the repair bills?

"A  I told them who did the motor work, and there was a motor kit put in it, which I had proof—it was because the parts were bought from this equipment place out on Lamar.

"Q  What did you tell them about the tractor?

"A  I will go through it again. I told them I put new rollers in, and new rails and new track bolts. * * *

"Q  Did you tell Shine what year model this tractor was?

"A  I don't believe I did.

"Q  By that, you mean you don't recall?

"A  I don't know.

"Q  You say you didn't, or you may have?

"A  So far as that goes, a year model in a tractor, you can't do that like you do a car. You don't say '1960 Model D–8', you say 'D–8 tractor, Serial Number so-and-so.'

"Q  Did you tell them this is a tractor that is only two years old?

"A  I did not.

"Q  Or three years old?

"A  I did not.

"Q  You are sure?

"A  Yes, and I am sure that at that particular time, Mr. Shine and Mr. Buck was in a better position to know heavy equipment than I was.

"Q  Did you tell Mr. Shine or Mr. Buck what year model that tractor was?

"A  I can't recall it if I did.

"Q  You may have, but you just don't recall it?

"A  I just can't recall it.

"Q  Then if either or both of them recall that you did tell them what year the model number was, or the year of its manufacture, you are not in a position to dispute that other than you can't remember one way or the other?

"A  No, because it was immaterial. They both of them knew heavy equipment, and they worked with it, and operated it, and it didn't make any difference if it was a 1919 or 1950 model, because it was there for itself, and they knew equipment. * * *

"A  *  *  *  We were talking in my office about it, and getting together on the price, so T. W. said, 'Well, Shine, drive the tractor. If it is in good shape, we can see about it,' and I said, 'It ought to be, the amount of money I spent,' so he said, 'How can we deal?' and I said, 'I don't know,' and so we talked on, and T. W. said, 'It is going to be about thirty days before Shine can go to work with the tractor—'

"Q  When you talked about those repairs, did you tell them as a result of those repairs, it was in as good as brand new condition?

"A  I said as good as new, not new, but in reconditioned shape. Just like you buy a reconditioned engine, but that doesn't make it as good as new.

"Q  You thought that with all those repairs that had been made, it was in about as good as new condition?

"A  I thought it was in good working order, and wouldn't give any trouble, except on heavy equipment, you do break something now and then."

When questioned about the execution of the $9300.00 note, Stelfox testified:

"Q  At that time, when you were talking about making that note, didn't Shine tell you; didn't Buck tell you about the fact this tractor had been constantly under repairs over there?

"A  The only time I heard anything about any repairs at all, they had to weld something up, he was talking about welding something on it.

"Q  That is the day you made the second note?

"A  That's right.

"Q  But as you recall, they said they had to weld something?

"A  It wasn't anything serious, I know.

"Q  You do not recall that they said it had been constantly under repair since they had it?

"A  I will take a paralyzed oath they didn't say it had been constantly under repairs.

"Q  Did they say it had been frequently under repairs?

"A  Well, you are always going to have that with heavy equipment.

"Q  But it is possible that they told you they were having it very frequently under repair?

"A  That is to be expected with heavy equipment—I don't know if they told me that.

"Q  Was there any complaint made about this tractor having to be repaired frequently?

"A  Not a bit.

"Q  Do you recall something having been said by Shine in relation to some bolts that were not properly put in, which caused it to break down?

"A  I don't remember, but of course a bolt can break on a tractor.

"Q  Do you recall that when some complaint was made that they found that one of their breakdowns had been because of the improper placing of bolts when it was being repaired, you said, 'Now that is fixed, the rest of it ought to be in good shape?'

"A  I wouldn't say I didn't say it, but I don't remember it. I do remember him saying he was doing something to the tractor, and I can't recall what he said, because it was immaterial; because the tractor

was sold, and you buy it with your eyes wide open. When you buy a used car, the dealer isn't going to come back ninety days or six months later and do any repairs to your car for nothing. I didn't sell it to him with a guarantee of anything, he bought the tractor as it was.

"Q Wasn't this agreement you and he had, when you and he were talking, wasn't there an agreement that because the man had lost a great deal of time when he wasn't able to work, and because of the repair expense to this tractor, that he had to go in making repairs to this tractor, that you agreed to knock off $700 on the price of that tractor?

"A Knock off what?

"Q Knock off $700 of the price of the tractor, to make up for that, and you said you would take a note for $9300?

"A No, sir."

It is our opinion that the findings of facts, copied above, are so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

The judgment of the Trial Court is reversed and this cause is remanded for another trial.

Reversed and remanded.

HUGHES, Justice (concurring).

In 1849, when Ritter v. Hamilton, 4 Tex. 325, was decided, the only statutes relating to sureties were embraced in an Act of the First Legislature of the State of Texas, 1846, entitled, "An Act to Regulate Proceedings in the District Courts,"[1] which are:

"INSTITUTION OF SUITS

\* \* \* \* \* \*

"Sec. 4. \* \* \* Be it further enacted, That no person shall be sued as endorser, as guarantor, or as security, unless suit shall have been, or is simultaneously commenced against the principal, except in cases where the principal resides beyond the limits of the State, or in a county that is not organized, or where he is insolvent."

"PLEADINGS.

\* \* \* \* \* \*

"Sec. 45. \* \* \* (relating to discontinuances) Provided, that this section shall not be so construed as to allow a plaintiff to discontinue, as to the principal, and take judgment against the endorser or surety [who is] jointly sued.

"Sec. 46. The principal and the endorser, or surety upon any instrument in writing, may be joined in the same suit, but no judgment in any such suit, shall be rendered against the endorser or surety, unless judgment is at the same time rendered against the principal, except where the plaintiff discontinues, as to the principal, because he resides beyond the limits of the State, or because he is insolvent, in which cases he may discontinue and take judgment."

In 1858, and subsequent to the decision in any Supreme Court case following Ritter v. Hamilton, 4 Tex. 325,[2] the Legislature (7th) passed an Act further regulating proceedings in District Courts in which the following sections appear:

"Sec. 14. Any person bound as surety upon any contract for the payment of money, or the performance of any act otherwise than by a bill of exchange or promissory note assignable or negociable by law, when the right of action has accrued, may require, by notice in writing, the creditor or obligee forth-

1. P. 365, Acts 1st Leg. 1846

2. This case, of course, excepted.

with to institute a suit upon the contract.

"Sec. 15. If the creditor or obligee, not being under legal disability, shall fail to bring his suit to the first term of the Court thereafter, or to the second term, showing good cause why he did not bring it to the first term, and prosecute the same to judgment and execution, the surety giving such notice, shall be discharged from all liability thereon.

"Sec. 16. When any suit is brought against two or more defendants upon any contract, any one or more of the defendants being surety for the others, the surety may, upon a written statement of the matter being set out in his or her answer, cause the question of suretyship to be tried and determined upon the issue made for the parties defendant at the trial of the cause or at any time before or after the trial, or at a subsequent term; but such proceedings shall not delay the suit of the plaintiff.

"Sec. 17. If the finding of such issue be in favor of the surety, the court shall make an order directing the Sheriff to levy the execution first upon the property of the principal, subject to execution, and situate in the county in which the judgment is rendered, before a levy shall be made upon the property of the surety; provided, so much property of the principal can be found, as will in the opinion of the Sheriff, be sufficient to make the amount of the Execution, otherwise the levy to be made on so much property of the principal as may be found, if any, and upon so much of the property of the surety as may be necessary to make the amount of the Execution; and the Clerk shall endorse a memorandum of the order of the Execution.

"Sec. 18. When any person being surety in any undertaking whatever, shall be compelled to pay any judgment, or any part thereof, or shall make any payment which is applied upon such judgment, by reason of such suretyship, or when any Sheriff or other officer, shall be compelled to pay any judgment or any part thereof, by reason of any default of such officer, except for failing to pay over any money collected, or for wasting property levied on, the judgment shall not be discharged by such payment, but shall remain in force for the use of the surety, officer, or other person making such payment; and after the judgment creditor is paid, so much of the judgment as remains undischarged, but having been paid by such surety, officer or other person, may be prosecuted to execution for the use of such surety, officer or other person.

"Sec. 19. Any one of several sureties, having paid and satisfied the judgment creditor, shall have the remedy provided in the preceding Section, against the co-sureties, to collect of them the ratable proportion each is equitably bound to pay.

"Sec. 20. The remedy provided for sureties by this act, extends to endorsers, guarantors, drawers of bills which have been accepted, and every other suretyship, whether created by express contract or by the operation of law."

As authorized and directed by the Constitution of 1876, the Legislature in 1879 adopted and established the "Revised Civil Statutes of the State of Texas."

This statutory revision contained chapters relating to Practice in the District and other Courts which included these Articles:

"Art. 1207. The acceptor of any bill of exchange, or any other principal obligor in any contract, may be sued either alone or jointly with any other party who may be liable thereon; but no judgment shall be rendered against such other party not primarily liable on such bill or other contract, unless judgment shall have been previously, or shall be

at the same time, rendered against such acceptor or other principal obligor, except where the plaintiff may discontinue his suit against such principal obligor as hereinafter provided.

"Art. 1208. The assignor, indorser, guarantor and surety upon any contract, and the drawer of any bill which has been accepted, may be sued without the necessity of previously or at the same time suing the maker, acceptor or other principal obligor, when he resides beyond the limits of the state, or in such part of the same that he can not be reached by the ordinary process of law, or when his residence is unknown and can not be ascertained by the use of reasonable diligence, or when he is dead, or actually or notoriously insolvent."

Laws relating to the rights of sureties were placed in "Title LXXV, PRINCIPAL and SURETY." They read:

"ART. 3660. Any person bound as surety upon any contract for the payment of money or the performance of any act when the right of action has accrued, may require, by notice in writing, the creditor or obligee forthwith to institute suit upon such contract.[3]

"ART. 3661. If the creditor or obligee, not being under legal disability, shall fail to bring his suit to the first term of the court thereafter, or to the second term, showing good cause why he did not bring it to the first term and prosecute the same to judgment and execution, the surety giving such notice shall be discharged from all liability thereon.

"ART. 3662. When any suit is brought against two or more defendants upon any contract, any one or more of the defendants being surety for the others, the surety may, upon a written statement of the matter being set out in his answer, cause the question of suretyship to be tried and determined upon the issue made for the parties defendant at the trial of the cause or at any time before or after the trial, or at a subsequent term; but such proceedings shall not delay the suit of the plaintiff.

"ART. 3663. If the finding of such issue be in favor of the surety the court shall make an order directing the sheriff to levy the execution first upon the property of the principal subject to execution, and situate in the county in which the judgment was rendered, before a levy shall be made upon the property of the surety, if so much property of the principal can be found as will in the opinion of the sheriff be sufficient to make the amount of the execution; otherwise the levy to be made on so much property of the principal as may be found, if any, and upon so much of the property of the surety as may be necessary to make the amount of the execution; and the clerk shall make a memorandum of such order on the execution.

"ART. 3664. When any person, being surety in any undertaking whatever, shall be compelled to pay any judgment, or any part thereof, or shall make any payment which is applied upon such judgment by reason of such suretyship, the said judgment shall not be discharged by such payment, but shall remain in force for the use of such surety, and shall be considered as assigned to such surety, together with all the rights of the creditor thereunder, to the extent of the payment thereon made by such surety, and interest thereon; and such surety shall be entitled to have execution thereon in the name of the creditor for the use of such surety against the principal debtor for the full amount of such payment and interest thereon and

3. It is to be noted that the exception of a "bill of exchange or promissory note as-
signable or negociable by law" contained in Sec. 14 of the 1858 statutes is omitted.

all ·costs, which execution shall ·be issued upon the application of such surety .to the clerk, or court, as the case may be, and shall be levied, collected and returned as in other cases.

."ART. 3665. Should there be more than one surety, and one or more of them has failed to pay his proportionate part of the judgment, execution may issue, as provided in the preceding article, against the principal for the use of the surety who has paid more than his proportionate part for the whole amount paid by him and interest thereon, and also against his co-sureties for their proportionate part of the excess so paid by him, and interest thereon.

"ART. 3666. If a sheriff or other officer shall be compelled to pay any judgment, or any part thereof, by reason of any default of such officer, except for failing to pay over any money collected, or for wasting property levied on, such sheriff or other officer shall be entitled to have execution therefor against the principal defendant in such judgment as provided in the case of a surety.

"ART. 3667. No surety shall be sued unless his principal is joined with him, or unless a judgment has previously been rendered against his principal, except in the cases provided for in article 1208.

"ART. 3668. The remedy provided for sureties by this title extends to indorsers, guarantors, drawers of bills which have been accepted, and every other suretyship, whether created by express contract or by the operation of law."

Art. 2284, R.C.S., 1879, under the Title Execution, provided for levy of execution first to be made on the property of the principal.

The next codification of the Civil Statutes of Texas was in 1895. These statutes followed the same pattern in regulating the rights of ·sureties as established in the Revised Civil Statutes of 1879. See Arts. 1203 and 1204, Ch. 5, Parties to Suits, R.C.S., 1895 and Title LXXXIV, PRINCIPAL and SURETY, Arts. 3811–3819 and Art. 2341, R.C.S., 1895. Similar treatment of the subject was accorded in the Revised Civil Statutes of· 1911. See Arts. 1842–3, Ch. 5, Parties to Suits, and Title 109, Principal and Surety, Arts. 6329–6337 and Art. 3732, R.C.S., 1911. The same is true of the statutory revision of 1925. See Arts. 1986–7, Title 42, Sec. 3, Parties to Suits, and Title 110, Principal and Surety, Arts. 6244–52, R.C.S., 1925. See also Arts. 2088 and 3786, R.C.S., 1925, respectively, regulating discontinuance as to principal obligor and levy of execution against property of surety.

The only changes made in these statutes since the 1925 recodification were that the substance of repealed Art. 6246 is now incorporated in Rule 32, T.R.C.P. and, similarly the substance Art. 6251 is now incorporated in Rule 31, id.

The Supreme Court in reversing our decision herein erroneously stated that our failure to follow Ritter v. Hamilton was because it had not been cited in recent years. What we said was that its force had been dispelled in the "light of subsequent legislation and judicial decisions." 363 S.W.2d 485.

Arts. 6244 and 6245, V.A.C.S., provide that a surety may require the obligee to institute suit against a principal and if not done the surety shall be discharged from liability. Under Buck v. Reed, the obligee upon receiving such request from the surety could, with impunity, reply, "Although I know full well that you are surety on the obligation which I hold, since you did not put 'surety' beneath your signature, I do not have to sue your principal. I will wait [limitations considered] until the wastrel (principal) has become insolvent and then I will sue you."

It will not do to say that the rights afforded a surety by these articles are not available to .sureties who do .not *sign* as

sureties. It has been held that they are so available. Sullivan v. Dwyer; 42 S.W. 355, San Antonio Civil Appeals, Georges v. Fricke, 283 S.W. 221, Austin Civil Appeals, writ ref.

In our previous opinion we cited and quoted from First Nat'l. Bank v. Alexander, Tex.Civ.App., 4 S.W.2d 298, to the effect a surety may avail himself of the protection which the law affords a surety where the creditor has knowledge of such relationship even though the suretyship does not appear on the face of the written obligation. This quotation was copied approvingly in Stetson v. First National Bank of Cleveland, Tex. Civ.App., 44 S.W.2d 792, also cited by us previously, in which a writ of error was refused by the Supreme Court. Neither of these cases was referred to by the Supreme Court in reversing our decision herein.

The effect of the refusal of a writ of error in the Cleveland Bank Case (1931) was to make its language the language of the Supreme Court. The result is that the Supreme Court has stated that the protection which the law gives a surety is available under the circumstances here. Certainly it cannot be denied that one of the protective enactments is contained in Rule 31, T.R.C.P.

Since this Rule is not quoted by the Supreme Court, I quote it:

"Rule 31. Surety Not To Be Sued Alone

"No surety shall be sued unless his principal is joined with him, or unless a judgment has previously been rendered against his principal, except in cases otherwise provided for in the law and these rules."

In fact this Rule, which we held was not properly observed, is cited only once in the opinion of the Supreme Court. I quote the whole paragraph in which the Court cites Rule 31:

"We hold that when a party signs a note in the capacity of a maker, the payee (or one standing in the shoes of a payee) may sue such maker singly and proceed to judgment upon the note without joining in the suit another or others who may also appear upon the note as co-makers. If in truth and in fact one of the co-makers stands in the relationship of a surety to another co-maker, the burden evolves upon the one claiming a surety's rights to set up those rights by proper pleading and bring into the suit such other parties as may be required to afford him appropriate relief. Rules 30, 31 and 32, Texas Rules of Civil Procedure. We do not have before us a case in which a party defendant signed a negotiable instrument which shows upon its face that he signed in some other capacity than that of a maker."

Rules 30 and 32, which the Court did not quote or give their substance, provide:

"Rule 30. Parties To Suits

"Assignors, indorsers and other parties not primarily liable upon any instruments named in the title of the Revised Civil Statutes of Texas, 1925, dealing with Bills and Notes, may be jointly sued with their principal obligors, or may be sued alone in the cases provided for in Articles 1986 and 1987 of such statutes.

"Rule 32. May Have Question of Suretyship Tried

"When any suit is brought against two or more defendants upon any contract, any one or more of the defendants being surety for the other, the surety may cause the question of suretyship to be tried and determined upon the issue made for the parties defendant at the trial of the cause, or at any time before or after the trial or at a subsequent term. Such proceedings shall not delay the suit of the plaintiff."

I have read and re-read these three Rules and I simply cannot find any language in them which supports the Court's holding that they require a surety to bring in his

principal under the circumstances present here. In fact, I cannot find anything in these Rules which supports any holding of the Supreme Court in the paragraph in its opinion citing such Rules.

Rule 30 authorizes suits against parties primarily and secondarily liable jointly, but it clearly restricts suits against those secondarily liable alone to the exceptions contained in Arts. 1986 and 1987, R.C.S., 1925.

Comment on Rule 31, in this regard, would be superfluous.

Rule 32 applies, by its lucid language, only to suits against "two or more defendants." This suit was against a single defendant, the surety.

The Supreme Court does not say that Rule 31 is vague, ambiguous or for any reason invalid. In Rudman v. Railroad Commission, 162 Tex. 579, 349 S.W.2d 717, we were reminded that,

" 'Courts must take statutes as they find them.' "

The application of this mandate requires obedience to Rule 31 with the result that a surety would be accorded his lawful rights. The Courts have frequently referred to a surety as a favorite of the law, and that a surety's liability is strictissimi juris. 39 Tex.Jur. p. 918. This is "a rule of substantive law relating to the nature of the surety's liability and his special defenses." Houston Fire and Casualty Ins. Co. v. E. E. Cloer Gen. Con., 217 F.2d 906, Fifth Cir.

In First National Bank of Victoria v. Skidmore, 30 S.W. 564 [1895], Galveston Civ.App., opinion by Williams, J., it was held that when it is known to the payee of a note that the relation of principal and surety exists between the makers of the note, although such relationship is not shown by the note, that an agreement, without the consent of the surety, not to sue the principal for a definite time, will release the surety.

In Shapleigh Hardware Co. v. Wells & Chestnutt, 90 Tex. 110, 37 S.W. 411, (1896),

the Court denied application of the rule stated in the preceding case to a situation where the parties obligated *subsequently* agreed between themselves, without the consent of the obligee, that one should be surety for the other. The Court, Judge Brown writing, in discussing the question states:

"In the case of Smith v. Shelden, Chief Justice Cooley undertakes to reason to the conclusion that such agreement would have the effect to change the contract without the consent of the creditor. He first lays down the correct rule that, as between themselves, the retiring partner became a surety for the other partner. Also another proposition to the effect that, *if a contract be made by two or more persons as joint obligors therein, but it does not appear from the face of the writing that one of them is surety for the others, and if it be not known to the obligee in the contract that such is the case, then all the obligors will be regarded as principals in so far as it affects the obligee until the fact of suretyship is made known to him, after which he must observe the rights of the surety in his dealing with the principal in the contract.* The learned judge then proceeds to reason that because, under such circumstances, the fact of suretyship being made know to the creditor imposed upon him the obligation to treat the surety as such from the time the information is received, it follows that the principal obligors in a contract may, by agreement between themselves, change the obligation of one or more from that of principal debtor to that of surety, and upon notice of such agreement to the obligee the same effect will be given as if the suretyship originated in the contract itself. This is evidently unsound reasoning. In the first case stated the contract was made by the party as a surety, but he was deprived of the protection given to a surety by the law, because the payee was an innocent holder of it for value without notice of his

rights as surety, and, upon notice being given, the character of the creditor as innocent holder ceased, and the terms of the contract became operative and in full effect as to all the parties; * * *.

*The doctrine asserted as to the rights of the surety, who contracted as such, after the suretyship was made known to the holder of the contract, is equitable in itself, and consistent with sound legal principles*; * * *" (Italics added.)

I am unable to distinguish, in principle, the enforcement of the surety's rights in cases where his relation to his principal is learned by the obligee after the execution of the contract from this case *where it was known from the inception of the transaction.*

Attention is also directed to present Article 6252, copied above as Art. 3668, R.C.S. 1879, not noticed in Reed and not in existence when Ritter was decided. This article extends the "remedy provided for sureties" to "every other suretyship." The preceding article, present Rule 31, provided that no surety shall be sued unless his principal is joined with him. Certainly the language of Art. 6252, R.C.S.1925, is broad enough to include the present express but unwritten suretyship. If so, then this statute alone should suffice for the purpose of holding that Ritter has been legislated away.

The Court in Reed cites and quotes from cases from California and Wisconsin to sustain its decision. This is indeed strange. The Courts of those states are in conflict with the decision of the Supreme Court of Texas in Howth cited in Reed by this Court and the Supreme Court regarding the effect of the Uniform Negotiable Instruments Act, Art. 5933, V.A.T.S., upon the rights of undisclosed sureties on negotiable instruments. See 11 C.J.S. Bills and Notes § 752 b, p. 321; Mortgage Guarantee Co. v. Chotiner, 8 Cal.2d 110, 64 P.2d 138, 108 A.L.R. 1080, S.Ct. of California.

The opinion in the California case contains a thorough and exhaustive discussion of this question and it reluctantly follows the majority rule in holding that the U.N.I.A. supersedes the general law of suretyship in determining rights and liabilities under negotiable instruments. Texas does not follow the majority rule as Howth discloses. By statutes, rules and Court decisions, Ritter and Buck to the contrary, the rights and remedies of sureties in Texas have been preserved to them even as to negotiable instruments when the obligee was not a holder in due course.

I commend the opinion in Chotiner and the authorities there cited to those who may be interested in a now academic study of the plainly given right of a surety to insist that his principal be joined with him when sued unless excused in accordance with law.

The Supreme Court in Buck regarded the question presented as "being one of procedure relating to necessary parties" and not one "of a plea in bar—an extension of payment which was not consented to by the obligor secondarily liable upon the note."

In Chotiner, supra, it was stated:

"While the cases so far cited have dealt almost entirely with the defense of an extension of time without the consent of the accommodation maker, the rulings have in general been broad enough to include the entire category of suretyship defenses."

The defense of a surety based on unauthorized extension of time of payment, which our Supreme Court would seemingly honor, is characterized by the Court in Chotiner in this language:

"We are the less reluctant to so hold (that the U.N.I.A. abrogated surety defenses to negotiable instruments) because of the fact that the defense of an extension of time is one of the more technical suretyship defenses, the injuries resulting to the surety by reason thereof being more likely to be theoretical than real."

This technical common law defense is preferred as indicated by Reed, to the plain-

ly worded Rule deliberately placed by the Supreme Court in our Rules of Civil Procedure for the guidance of attorneys, their clients, and Courts. I submit that there is no reasonable basis for this preferment. Whatever name may be given to Rule 31, in this case its enforcement would, it appears, preclude suit against Buck. As to him, it is the equivalent of a plea in bar.

I have tried to amplify here the basis of our previous decision which was that Ritter in the "light of subsequent legislation and judicial decisions" was no longer law. I also accept the suggestion made by the Supreme Court that the deseutude into which the early Supreme Court cases have fallen is highly significant. That the rule they stand for has not been invoked in this century is strong evidence that it does not exist. This case was pled and tried by the parties, their eminent counsel, and by the Trial Court as they and this Court considered the law to be. It is simply incredible to me that the Bench and Bar of this State have overlooked Ritter v. Hamilton for three quarters of a century, the Supreme Court for more than one hundred years.